No. 24-7807

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

SAN LUIS OBISPO COASTKEEPER, et al.,

Plaintiffs – Appellees,

v.

COUNTY OF SAN LUIS OBISPO,

Defendant – Appellant.

_____

On Appeal from the United States District Court
for the Central District of California
Honorable Sherilyn Peace Garnett, District Judge

_____

**BRIEF AMICUS CURIAE OF PACIFIC LEGAL FOUNDATION
AND CALIFORNIA FARM BUREAU FEDERATION IN SUPPORT
OF APPELLANT COUNTY OF SAN LUIS OBISPO AND REVERSAL**

_____

DAMIEN M. SCHIFF
CHARLES T. YATES
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
DSchiff@pacificlegal.org
CYates@pacificlegal.org

*Attorneys for Amici Curiae Pacific Legal Foundation
and California Farm Bureau Federation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus Curiae Pacific Legal Foundation, a nonprofit corporation organized under the laws of California, hereby states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, Amicus Curiae California Farm Bureau Federation, a nonprofit corporation organized under the laws of California, hereby states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ........................................................................ iii

IDENTITY AND INTEREST OF AMICI CURIAE ................................1

SUMMARY OF ARGUMENT ...................................................................3

ARGUMENT .............................................................................................5

   I.     CONGRESS DID NOT INTEND THE ENDANGERED
         SPECIES ACT TO OVERRIDE TRADITIONAL EQUITABLE
         PRINCIPLES GOVERNING INJUNCTIVE RELIEF...............................5

CONCLUSION...........................................................................................13

CERTIFICATE OF COMPLIANCE.........................................................14

CERTIFICATE OF SERVICE ..................................................................15

# TABLE OF AUTHORITIES

## Cases

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987)...................................................................7

*Bennett v. Spear,*
  520 U.S. 154 (1997)...................................................................9

*California v. Bernhardt,*
  No. 4:19-cv-06013-JST (N.D. Cal. filed Sept. 25, 2019).....................................1

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.,*
  789 F.3d 1075 (9th Cir. 2015) ......................................................10

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
  67 F.4th 1027 (9th Cir. 2023) ......................................................10

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944)...................................................................6

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
  70 F.4th 582 (D.C. Cir. 2023).......................................................10

*Marbled Murrelet v. Babbitt,*
  83 F.3d 1068 (9th Cir. 1996) .......................................................10

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) .......................................................10

*N.M. Farm & Livestock Bureau v. Dep't of Interior,*
  952 F.3d 1216 (10th Cir. 2020) ......................................................1

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  422 F.3d 782 (9th Cir. 2005) .....................................................7, 10

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
  551 U.S. 644 (2007)...................................................................9

*NRDC v. Winter,*
  530 F. Supp. 2d 1110 (C.D. Cal. 2008) ..............................................8

*Sierra Club v. Marsh,*
  816 F.2d 1376 (9th Cir. 1987) ......................................................10

iii

*Skipper v. U.S. Fish & Wildlife Serv.*,
  No. 1:21-cv-00094-JB-B (S.D. Ala. filed Feb. 26, 2021) ...................................1

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024).........................................................................5-6, 8-9

*TVA v. Hill*,
  437 U.S. 153 (1978)............................................................................ 3-4, 7

*United States v. Oakland Cannabis Buyers' Co-op*,
  532 U.S. 483 (2001).................................................................................7

*Water Keeper Alliance v. U.S. Dep't of Defense*,
  271 F.3d 21 (1st Cir. 2001)................................................................. 9-10

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)................................................................................5, 7

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018)......................................................................................1

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008).................................................................................5, 8

**Statutes**

15 U.S.C. § 1116(a) ...................................................................................6

16 U.S.C § 1535(g)(2)(B)(ii) ....................................................................6

16 U.S.C. § 1539(a)(1)(B) .........................................................................7

16 U.S.C. § 1540(e)(6) ...............................................................................5

16 U.S.C. § 1540(g)(1)...............................................................................6

16 U.S.C. § 1540(g)(1)(A) .........................................................................5

18 U.S.C. § 3626(a)(2) ...............................................................................6

33 U.S.C. § 1319(b) ...................................................................................5

33 U.S.C. § 1365(a) ...................................................................................5

## Other Authorities

Adler, Jonathan H., *Conservative Principles for Environmental Reform*,
23 Duke Envtl. L. & Pol'y F. 253 (2013) ...................................................... 12-13

Adler, Jonathan H., *Money or Nothing: The Adverse Environmental
Consequences of Uncompensated Land Use Controls*,
49 B.C. L. Rev. 301 (2008) ................................................................................12

Hearing on ESA Consultation Impediments to Economic and
Infrastructure Development before the House National Resources
Committee, Subcommittee on Oversight and Investigations
(Mar. 28, 2017) ......................................................................................................2

Hearing on the Modernization of the Endangered Species Act before
the House Natural Resources Committee (Sept. 26, 2018) ..................................2

Kirchheim, Diana, Comment, *The Endangered Species Act: Does
'Endangered' Refer to Species, Private Property Rights, the Act
Itself, or All of the Above?*,
22 Seattle U. L. Rev. 803 (1999) ........................................................................11

Middleton, Brandon M., *Restoring Tradition: The Inapplicability of
TVA v. Hill's Endangered Species Act Injunctive Relief Standard
to Preliminary Injunctive Relief of Non-Federal Actors*,
17 Mo. Envtl. L. & Pol'y Rev. 318 (2010) .................................................. 11-12

*Petitions to Repeal 50 C.F.R. § 17.31*,
https://pacificlegal.org/case/national-federation-of-independent-
businesses-v-fish-and-wildlife-service-1-1502-washington-
cattlemens-association-v-fish-and-wildlife-service-1-1514/ ...............................2

Ruhl, J.B., *The Endangered Species Act's Fall from Grace in
the Supreme Court*,
36 Harv. Envtl. L. Rev. 487 (2012) ......................................................................9

Schiff, Damien, *A petition to resolve the Endangered Species
Act taxonomy debate*, PacificLegal.org (Nov. 13, 2017),
https://pacificlegal.org/a-petition-to-resolve-the-endangered-
species-act-taxonomy-debate/ ..............................................................................2

Schiff, Damien M., *The Endangered Species Act at 40: A Tale of
Radicalization, Politicization, Bureaucratization, and Senescence*,
37 Environs: Envtl. L. & Pol'y J. 105 (2014) .......................................................2

v

Schiff, Damien M., *Judicial Review Endangered: Decisions Not to Exclude Areas from Critical Habitat Should Be Reviewable Under the APA*, 47 Envtl. L. Rep. News & Analysis 10,352 (2017) ................................................ 2

Wood, Jonathan, *The Road to Recovery: How Restoring the Endangered Species Act's Two-Step Process Can Prevent Extinction and Promote Recovery*, PERC Reports (2018), https://www.perc.org/wp-content/uploads/2018/04/endangered-species-road-to-recovery.pdf ................................................................................ 2

Wood, Jonathan, *Take it to the Limit: The Illegal Regulation Prohibiting the Take of Any Threatened Species Under the Endangered Species Act*, 33 Pace Envtl. L. Rev. 23 (2015) .......................................................................... 2

## IDENTITY AND INTEREST OF AMICI CURIAE

Pursuant to Federal Rule of Appellate Procedure 29, Pacific Legal Foundation (PLF) and California Farm Bureau Federation respectfully submit this amicus curiae brief in support of Defendant-Appellant County of San Luis Obispo.

PLF is the nation's leading public interest legal organization that advocates for limited government, property rights, and the separation of powers, particularly when these causes are threatened by environmental regulation, such as the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544. PLF attorneys have been counsel of record in many cases addressing the interaction of the ESA, property rights, and the separation of powers.[1] They have produced substantial scholarship on

---

[1] *See, e.g.*, *Skipper v. U.S. Fish & Wildlife Serv.*, No. 1:21-cv-00094-JB-B (S.D. Ala. filed Feb. 26, 2021) (representing private landowners in a challenge to the designation of critical habitat for the black pinesnake); *California v. Bernhardt*, No. 4:19-cv-06013-JST (N.D. Cal. filed Sept. 25, 2019) (representing conservationist landowners as intervenors to defend the 2019 Endangered Species Act regulatory reforms); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9 (2018) (representing private landowners in a challenge to the designation of critical habitat for the endangered dusky gopher frog); *N.M. Farm & Livestock Bureau v. Dep't of Interior*, 952 F.3d 1216 (10th Cir. 2020) (representing a group of New Mexico ranchers in a challenge to the designation of critical habitat for the endangered jaguar).

these subjects.[2] And PLF attorneys often provide their expertise to policy makers through congressional testimony,[3] rulemaking petitions,[4] and policy papers.[5]

California Farm Bureau Federation ("Farm Bureau") is a nongovernmental, nonprofit, voluntary membership California corporation whose purpose is to protect and promote agricultural interests throughout the State of California and to find solutions to the problems of the farm, the farm home, and the rural community. Farm Bureau is California's largest farm organization, comprised of 54 county Farm Bureaus currently representing approximately 26,000 agricultural, associate, and

---

[2] *See, e.g.*, Damien M. Schiff, *Judicial Review Endangered: Decisions Not to Exclude Areas from Critical Habitat Should Be Reviewable Under the APA*, 47 Envtl. L. Rep. News & Analysis 10,352 (2017); Jonathan Wood, *Take it to the Limit: The Illegal Regulation Prohibiting the Take of Any Threatened Species Under the Endangered Species Act*, 33 Pace Envtl. L. Rev. 23 (2015); Damien M. Schiff, *The Endangered Species Act at 40: A Tale of Radicalization, Politicization, Bureaucratization, and Senescence*, 37 Environs: Envtl. L. & Pol'y J. 105 (2014).

[3] *See, e.g.*, Hearing on the Modernization of the Endangered Species Act before the House Natural Resources Committee (Sept. 26, 2018); Hearing on ESA Consultation Impediments to Economic and Infrastructure Development before the House National Resources Committee, Subcommittee on Oversight and Investigations (Mar. 28, 2017).

[4] *See, e.g.*, Damien Schiff, *A petition to resolve the Endangered Species Act taxonomy debate*, PacificLegal.org (Nov. 13, 2017), https://pacificlegal.org/a-petition-to-resolve-the-endangered-species-act-taxonomy-debate/; *Petitions to Repeal 50 C.F.R. § 17.31*, https://pacificlegal.org/case/national-federation-of-independent-businesses-v-fish-and-wildlife-service-1-1502-washington-cattlemens-association-v-fish-and-wildlife-service-1-1514/.

[5] *See* Jonathan Wood, *The Road to Recovery: How Restoring the Endangered Species Act's Two-Step Process Can Prevent Extinction and Promote Recovery*, PERC Reports (2018), https://www.perc.org/wp-content/uploads/2018/04/endangered-species-road-to-recovery.pdf.

collegiate members in 57 counties. Farm Bureau strives to protect and improve the ability of farmers and ranchers engaged in production agriculture to provide a reliable supply of food and fiber through responsible stewardship of California's resources. Farm Bureau also aims to improve the ability of individuals engaged in production agriculture to utilize California's resources to produce food and fiber in the most profitable, efficient, and responsible manner possible guaranteeing our nation a domestic food supply. To that end, Farm Bureau actively participates in state and federal legislative, regulatory, and legal advocacy relating to water supply and use on behalf of its members.

In this brief, Amici provide the Court with a helpful analysis of the case law explaining when Congressional enactments displace the courts' traditional equitable authority, and whether the ESA is such an enactment.[6]

## SUMMARY OF ARGUMENT

Federal courts within the Ninth Circuit regularly ignore traditional equitable rules when deciding whether to issue injunctive relief under the Endangered Species Act. Much of this subordination is the result of these courts' misapplication of the Supreme Court's decision in *TVA v. Hill*, 437 U.S. 153 (1978). In that case, the Court

---

[6] By email, Appellant and Appellees have consented to the filing of this amicus brief. No party or party's counsel authored this brief in whole or in part. No party or party's counsel, or any other person—excepting Amici, their members, and their counsel—contributed money for the brief's preparation or submission.

ruled that, through the ESA, Congress intended "to halt and reverse the trend toward species extinction, whatever the cost," *id*. at 184, and thus, when it comes to deciding whether to issue an injunction under the ESA, "the balance [of the equities] has been struck in favor of affording endangered species the highest of priorities," *id*. at 194. These capacious propositions cannot, however, be read in isolation. As subsequent Supreme Court rulings have made clear, *TVA*'s discussion of equity and the ESA is limited to the case's unique posture, in which the government conceded that the challenged activity would run afoul of a categorical statutory prohibition, the violation of which could only be remedied through injunctive relief. Further, subsequent decisions have affirmed that the traditional rules of equity do not cease to apply merely because an environmental statute authorizes injunctive relief.

In failing to recognize these limitations on *TVA*'s broad declarations, this Court's case law has turned the ESA into an overriding legal mandate that upends the federal judiciary's centuries-old injunction jurisprudence. This appeal presents a case in point, with the district court relegating to the status of afterthought, in the name of protecting ESA-listed species, the legitimate and urgent public interest in maintaining a safe and adequate supply of water for domestic and agricultural uses. This Court, however, can correct the aberrant reading of *TVA*, and of the ESA, which has for decades beset the Ninth Circuit's case law.

## ARGUMENT

## I

## CONGRESS DID NOT INTEND THE ENDANGERED SPECIES ACT TO OVERRIDE TRADITIONAL EQUITABLE PRINCIPLES GOVERNING INJUNCTIVE RELIEF

When deciding whether to issue a preliminary injunction, courts customarily consider four factors: the likelihood of success on the merits, the likelihood of irreparable harm, the balance of the equities, and the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Congress can change this analysis, but such alteration requires "a clear command" to overcome the "strong presumption" that the traditional, default framework applies. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024).

The ESA lacks such a clear command; the statute merely authorizes the Attorney General, or a citizen plaintiff, to seek "to enjoin any person" alleged to be in violation of the law. *See* 16 U.S.C. § 1540(e)(6), (g)(1)(A). This is essentially the same injunction authorization found in the Clean Water Act, *see* 33 U.S.C. §§ 1319(b), 1365(a), which the Supreme Court has held does not displace the traditional equitable factors, *see Romero-Barcelo*, 456 U.S. at 312-13. Indeed, even much stronger language—for example, the Emergency Price Control Act of 1942's command that an injunction "shall be granted" under certain circumstances—has

been held insufficient to overcome the presumption that the traditional equitable framework applies. *See Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944); *Starbucks*, 602 U.S. at 348. It follows that the ESA is subject to the default rules of equity governing injunctions.

That conclusion is confirmed by comparing the ESA to laws that do displace the traditional rules. For example, the Prison Litigation Reform Act directs courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(2). As another example, a plaintiff alleging a trademark violation enjoys, under certain circumstances, "a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a). The ESA, however, has no analogous language.[7] When, therefore, a statute like the ESA "omits any specific instruction that suggests Congress altered the traditional equitable rules," those rules continue to apply. *Starbucks*, 602 U.S. at 348.

To be sure, the Supreme Court's ruling in *TVA* has often been cited as authority for such displacement by parties, such as Appellees, who seek to enjoin activities

---

[7] If anything, the ESA contains text flatly inconsistent with a general displacement reading. Specifically, the ESA's citizen suit provision provides that the district court "shall compel" the Secretary to apply the ESA's take prohibition in limited circumstances outlined in 16 U.S.C § 1535(g)(2)(B)(ii) "if the court finds that the allegation that an emergency exists is supported by substantial evidence." 16 U.S.C. § 1540(g)(1). This suggests that, for other types of citizen suit (including that brought by Appellees), the district court retains its traditional discretion in whether to award injunctive relief.

6

alleged to violate the ESA. *See, e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005). But *TVA*'s aphoristic declarations must be considered in light of the case's peculiar context, especially the government's concession that construction of the Tellico Dam would violate Section 7 of the ESA and likely result in the total destruction of the snail darter's critical habitat. *See TVA*, 437 U.S. at 171 & n.17. As the Supreme Court later explained, *TVA*'s equitable analysis turned on the point that, at the time, Section 7 contained "a flat ban on the destruction of critical habitats." *Romero-Barcelo*, 456 U.S. at 314. Thus, failure to enjoin the construction of Tellico Dam "would have ignored the 'explicit provisions of the Endangered Species Act.'" *Id*. (quoting *TVA*, 437 U.S. at 173). *Accord Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 543 n.9 (1987). It therefore follows that *TVA*'s teaching on the availability of injunctive relief in ESA cases is much less relevant in circumstances such as those that obtain here, where there has been no final adjudication of any statutory violation, and where the ESA does not imposes "a flat ban" at all but instead offers a permitting system to authorize the very activity—take of listed species—sought to be enjoined. *See* 16 U.S.C. § 1539(a)(1)(B). *Cf. United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496-97 (2001) (distinguishing *TVA* on the ground that the district court there had no means other than an injunction to ensure compliance with the ESA).

7

That *TVA*'s precedential value is essentially limited to its unique facts is confirmed by the Supreme Court's ruling in *Winter*. There, the Supreme Court rejected this Court's rule that a plaintiff could obtain a preliminary injunction without having to show a likelihood of irreparable harm. *See Winter*, 555 U.S. at 21-22. The Supreme Court also held that, on the record before it, the balance of the equities and the public interest strongly weighed against an injunction of the Navy's sonar training. The Court so ruled despite the possibility that, without an injunction, the sonar training would "injure marine mammals or alter their behavioral patterns." *Id*. at 26. The Court's conclusion is especially significant for this appeal, given that the Navy's activities were expected to "cause widespread harm to nearly thirty species of marine mammals, *including five species of endangered whales*." *NRDC v. Winter*, 530 F. Supp. 2d 1110, 1118 (C.D. Cal. 2008) (emphasis added). Notwithstanding this potential harm to endangered wildlife, the Court stated approvingly the apparently categorical assertion that "the balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter*, 555 U.S. at 32.

Similarly, in *Starbucks*—the Court's most recent decision on when and how Congress can displace the courts' traditional equity rules—*TVA* was only mentioned in passing, and even then solely in a single-justice concurrence and dissent. *See Starbucks*, 602 U.S. at 354 (Jackson, J., concurring in part). That too is noteworthy,

8

given that the Court's majority opinion offers several examples of displacement—without mentioning *TVA* or the ESA. *See id.* at 348 (majority opinion).

More generally, the Supreme Court has rejected attempts to read *TVA* broadly so as to expand the ESA's reach. For example, in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the Supreme Court limited *TVA*'s interpretation of Section 7 to discretionary federal action, *id*. at 669-71. Similarly, in *Bennett v. Spear*, 520 U.S. 154 (1997), the Court rejected the proposition that Section 7 is exclusively concerned with species preservation, instead holding that it also has the "objective . . . to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives," *id*. at 176-77. *See generally* J.B. Ruhl, *The Endangered Species Act's Fall from Grace in the Supreme Court*, 36 Harv. Envtl. L. Rev. 487, 532 (2012) (concluding that *TVA* "is essentially a dead letter in the Court's environmental jurisprudence").

The Supreme Court is not the only judicial body that has recognized *TVA*'s limited continuing applicability. Various lower court rulings have rejected broad readings of *TVA*, *see Water Keeper Alliance v. U.S. Dep't of Defense*, 271 F.3d 21, 34 (1st Cir. 2001) ("While these precedents [including *TVA*] direct us to give the endangerment of species, as alleged by Water Keeper, the utmost consideration, we do not think that they can blindly compel our decision in this case because the harm

9

asserted by the Navy implicates national security . . . ."), or otherwise limited *TVA*'s applicability to its particular context, *see Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023) (emphasizing subsequent amendments to the ESA following *TVA* and Congress's desire to "lighten[] the load to avoid paralysis"). And this Court has recently emphasized that the ESA's terms are, like those of any other statute, to be interpreted according to their "ordinary or natural meaning[.]" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1036 (9th Cir. 2023) (citation omitted).

Although certain decisions from this Court, dating back to the 1980s, have read *TVA* to preclude district courts from considering the balance of the equities and the public interest in deciding whether to enjoin an activity that may violate the ESA, *see Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015); *Nat'l Wildlife Fed'n*, 422 F.3d at 793-94; *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996); *Sierra Club v. Marsh*, 816 F.2d 1376, 1382-84 (9th Cir. 1987), these authorities cannot survive *Starbucks* and *Winters*. Normally, a panel of this Court is bound by the decisions of this Court. But a panel is not bound when "the relevant court of last result [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

That is precisely what *Starbucks* and *Winter* have done to this Court's precedents reading *TVA* broadly. As discussed above, *Starbucks* and *Winter* establish, among other salient points, that (i) the traditional equitable rules apply even when harm to endangered animals is contemplated, (ii) the strong presumption that the traditional rules apply is overcome only by a clear statutory command, (iii) a general authorization for injunctive relief like that found in the ESA is not a clear statutory command to displace traditional equitable rules, and thus, (iv) *TVA*'s displacement conclusion must be limited to the decision's unique posture, particularly the government's concession that the enjoined activity was categorically prohibited by the ESA's then-existing terms.

Reigning in this Circuit's overbroad reading of *TVA* would not only help restore the Court's equity jurisprudence, it would also result in a fairer and more effective administration of the ESA. "By shifting the burden of species conservation to private property owners, the ESA has caused people to fear species conservation instead of encouraging property owners to become part of the solution by conserving species on their own property." Diana Kirchheim, Comment, *The Endangered Species Act: Does 'Endangered' Refer to Species, Private Property Rights, the Act Itself, or All of the Above?*, 22 Seattle U. L. Rev. 803, 805 (1999). Such fear is exacerbated "by the judicial practice of automatically tipping the scales of equity in favor of endangered species." Brandon M. Middleton, *Restoring Tradition: The*

11

*Inapplicability of TVA v. Hill's Endangered Species Act Injunctive Relief Standard to Preliminary Injunctive Relief of Non-Federal Actors*, 17 Mo. Envtl. L. & Pol'y Rev. 318, 353 (2010). But if the economic and social impacts of ESA regulation can be used to moderate the statute's potential rigor—through, for example, judicial balancing of the equities and acknowledgment of the broader public interests at stake in ESA regulation—landowners will benefit through a greater respect of their property rights. And not just landowners; the environment itself will be the better for it. That is because property owners will be more likely to disclose information and to cooperate with researchers if they know that their rights will not be infringed because of species regulation. *See* Jonathan H. Adler, *Money or Nothing: The Adverse Environmental Consequences of Uncompensated Land Use Controls*, 49 B.C. L. Rev. 301, 332 (2008) ("The threat of land use regulation under statutes like the ESA . . . discourages private landowners from disclosing information and cooperating with scientific research on their land, further compromising species conservation efforts."). Further, secure protection of private property rights would encourage property owners to maintain their land in species-friendly condition. *See* Jonathan H. Adler, *Conservative Principles for Environmental Reform*, 23 Duke Envtl. L. & Pol'y F. 253, 275 (2013) ("[T]he presence of a listed species on private land results in the imposition of regulatory controls on private land-use—controls that are unwelcome even to conservation-minded landowners. The end result, as

12

empirical research has shown, is a decline in endangered species habitat on private land. Greater protection of property rights could actually enhance species conservation.") (footnotes omitted).

## CONCLUSION

The district court's preliminary injunction analysis turns upon an erroneous reading of *TVA*, one that ignores more recent Supreme Court decisions emphasizing that (i) the traditional rules of equity can be displaced only by clear statutory command, (ii) mere authorizing language like that found in the ESA is inadequate to displace the traditional rules, and (iii) *TVA*'s precedential authority is limited to its unique context of a categorical statutory prohibition that could be enforced only through injunctive relief. Moreover, the district court's reading of *TVA* results in bad environmental policy, leading to the violation of property rights and the thwarting of valuable voluntary conservation efforts. For these reasons, the district court's preliminary injunction order should be reversed.

DATED: January 31, 2025.

Respectfully submitted,

DAMIEN M. SCHIFF
CHARLES T. YATES

s/ Damien M. Schiff
DAMIEN M. SCHIFF

*Attorneys for Amici Curiae Pacific Legal Foundation and California Farm Bureau Federation*

13

**Form 8. Certificate of Compliance for Briefs**
**9th Cir. Case Number 24-7807**

I am the attorney or self-represented party.

**This brief contains 3,089 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Damien M. Schiff      **Date** January 31, 2025
         DAMIEN M. SCHIFF

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Damien M. Schiff
DAMIEN M. SCHIFF